DISCIPLINARY COUNSEL *v.* SHIMKO.

[Cite as *Disciplinary Counsel v. Shimko,* **134 Ohio St.3d 544, 2012-Ohio-5694.**]

*Attorneys—Misconduct—False statements concerning qualifications or integrity of a judge—Stayed suspension.*

(No. 2012-1002—Submitted September 12, 2012—Decided December 6, 2012.)

ON CERTIFIED REPORT by the Board of Commissioners on Grievances and Discipline of the Supreme Court, No. 11-069.

_____

**PFEIFER, J.**

{¶ 1} Respondent, Timothy Andrew Shimko of Cleveland, Ohio, Attorney Registration No. 0006736, was admitted to the practice of law in Ohio in 1976.

{¶ 2} On August 15, 2011, relator, disciplinary counsel, filed a one-count formal complaint against Shimko, alleging that Shimko had made statements with knowledge that they were false or with reckless disregard as to their truth or falsity concerning the qualification or integrity of a judicial officer, in violation of Prof.Cond.R. 8.2(a). Shimko was also charged with engaging in conduct that adversely reflects on his fitness to practice law, in violation of Prof.Cond.R. 8.4(h).

{¶ 3} Shimko answered the complaint. He admitted making the statements, but denied that the statements were false. He also denied that they impugned the qualifications or integrity of the judicial officer, Judge Richard Markus.

{¶ 4} The board adopted the panel's recommendation that Shimko be suspended from the practice of law for a period of six months, relying on *Disciplinary Counsel v. Gardner,* 99 Ohio St.3d 416, 2003-Ohio-4048, 793 N.E.2d 425, and *Disciplinary Counsel v. Proctor,* 131 Ohio St.3d 215, 2012-

Ohio-684, 963 N.E.2d 806. Shimko objects to the board's findings and recommended sanction, and seeks instead dismissal or a stayed suspension.

{¶ 5} Upon consideration of the report of the board, the findings of the board, the briefs of the parties, and oral argument, we conclude that Shimko violated Prof.Cond.R. 8.2(a) and 8.4(h). We suspend him from the practice of law for a period of one year with the entire suspension stayed on condition that he commit no further misconduct.

## MISCONDUCT

{¶ 6} The specific allegations involve events between visiting Judge Markus and Shimko, who was one of the attorneys for the parties in *First Fed. Bank of Ohio v. Angelini,* Crawford County Court of Common Pleas Case No. 03 CV 0098. The issues involve statements made during three separate periods of time.

{¶ 7} The first time period involved an unrecorded telephone conference on October 9, 2008, between Judge Markus and the attorneys in the *First Fed. Bank* case. During the telephone conference, which was initiated primarily to address Shimko's request for a continuance of the trial, the conversation shifted to Shimko's alleged unwillingness to enter into stipulations, despite his having filed proposed stipulations before the telephone conference. The following day, Shimko filed a motion to recuse Judge Markus along with an affidavit of disqualification with the Supreme Court of Ohio, alleging that Judge Markus had exhibited bias and prejudice against Shimko during the telephone conference. In the affidavit of disqualification, Shimko alleged that Judge Markus had stated that he "had lost all respect" for Shimko, had stated that he thought that Shimko was "incompetent for embarking upon such a trial strategy," and had "impliedly threatened to punish [Shimko's] client if [Shimko] further disappointed" Judge Markus.

**{¶ 8}** Judge Markus denied making the comments attributed to him. The other attorneys involved in the conference filed affidavits that supported either Judge Markus's denial or Shimko's allegations.

**{¶ 9}** The second time period involved Judge Markus's presiding over the trial in the *First Fed. Bank* case. On February 6, 2009, after an eight-day trial, Judge Markus declared a mistrial based upon (1) inconsistencies between the jury's verdict and answers to interrogatories and (2) Shimko's misconduct during the trial, which, according to the judge, deprived the plaintiff of a fair trial. Examples of misconduct were offered by the board to show the mindset and motivation of Shimko in making allegations against Judge Markus in Shimko's later court filings. In the board's opinion, these incidents show that Shimko's later allegations were false. Shimko relied on these excerpts to the contrary: to show that his allegations concerning Judge Markus were justified and reasonable.

**{¶ 10}** One such incident occurred during voir dire, when Shimko challenged a juror for cause because the juror was a depositor of one of the banks involved in the case. In the ensuing discussion, which occurred outside the jury's hearing, Judge Markus denied the challenge and added, "If, in fact, we were to accept your view and to disqualify all of the jurors who are depositors in one of these two institutions, we may well have to seek a change of venue." This comment led to the following exchange:

> Mr. Shimko: Wouldn't bother me, Your Honor.
> The Court: Are you moving for that?
> Mr. Shimko: No, I am not.
> The Court: Oh, all right.
> Mr. Shimko: Does it come with a change of judge?
> The Court: I'm interested in your comment. Is that something that you think is appropriate?

Mr. Shimko: Well, Your Honor, I think we have all avoided speaking about the 400-pound gorilla elephant that's in the room. And I still must go on the record to say that the Angelini Defendants have no confidence that they can obtain a fair trial in this case.

The Court: I'm sorry that you have that view. I can assure you, sir, that I have no favor or disfavor for you or any of the lawyers or any of the litigants.

I may disagree with your view on some legal issues or on some strategy that you choose to follow, but I can assure you that I will give you and every other litigant the best I can of a fair trial using the rules of law as I understand them and the evidence that I present—that I hear. I don't present evidence. I'm really sorry that you have to make that statement, Mr.—

Mr. Shimko: Indeed, I am too, Your Honor.

{¶ 11} On several other occasions—including during cross-examination of a witness, during use of an exhibit, and before and during closing argument—Shimko interacted with Judge Markus in what the board referred to as "a disrespectful and confrontational manner." For example, during the trial, opposing counsel called John Angelini in his case-in-chief. John Angelini was the father of Shimko's client and also one of Shimko's witnesses. During a recess, Judge Markus advised Shimko that he was not permitted to use leading questions when questioning John Angelini.

The Court: I have advised Counsel that my reading of Evidence Rule 611 indicates that a party questioning someone identified with an adverse party shall be permitted to use leading

4

questions, and that is why I had no problem with the questions asked by counsel for the Plaintiff.

I suggested to other counsel that I view that this witness is identified with Jeffrey Angelini and, therefore, his counsel should avoid using leading questions; that counsel for Galion Bank can use leading questions.

\* \* \*

Mr. Shimko: Unless they call them in their direct case-in-chief, and that's what they did. And I'm entitled to cross-examine in his case-in-chief, Your Honor.

The Court: I appreciate your position.

Mr. Shimko: Don't appreciate yours.

\* \* \*

Mr. Shimko: Let me assert one more, then. I think this is further evidence of a bias and prejudice of the Court, Your Honor.

{¶ 12} Shimko cites other examples that occurred before, during, and after trial to demonstrate that Judge Markus was biased, that he appeared to be biased, and that he acted on his bias. For example, Judge Markus ruled that based on Shimko's lateness in paying an expert-witness fee, Shimko could not use the witness's deposition at trial. Although Shimko concedes that he could be sanctioned for the late payment to the expert witness, he argues that the sanction was unusually harsh, contrary to his experience in practice, and designed to influence the merits of the case. Shimko also argues that the reasons for Judge Markus's granting of a mistrial—particularly the allegation of Shimko's misconduct—were unwarranted.

{¶ 13} In addition, Shimko points to a posttrial hearing and phone conference at which Judge Markus sua sponte held that because Shimko had not

properly substituted parties, Shimko would be precluded from participating in the hearing. Judge Markus also required Shimko to pay for his own court reporter in the phone conference.

{¶ 14} The third series of events involved the filing of appellate briefs and additional posttrial affidavits of bias and prejudice. Shimko filed an appeal in the Third District Court of Appeals on September 1, 2009. In his brief, Shimko made several comments regarding Judge Markus's integrity, including the following:

- When the trial court realized that the Answers to the Interrogatories mandated a judgment in favor of Jeffrey Angelini and against First Federal, the trial court's bias once again surfaced and he contrived a means to find that the jury was now somehow confused, even though they had followed his instructions to the letter.

- The court's ruling, motivated by its own agenda, was nothing but an abuse of discretion.

- Throughout the trial, the trial judge was so vindictive in his attitude toward appellant's counsel that he became an advocate for First Federal. In short, the trial judge was trying First Federal's counsel's case for him.

{¶ 15} Shimko also filed a brief in which he further discussed Judge Markus's integrity:

- The absurdity of the trial court's conduct in this instance ought to underscore the whimsical lengths to which it was willing to go to deny Jeffrey Angelini his verdict.

6

- In fact, the trial court felt that its contention that the jury was confused was so thin that it had to resort to manufacturing allegations of attorney misconduct to obscure his own abuse of discretion.

- When the trial court realized that the jury had returned a verdict for Jeffrey Angelini, he arbitrarily disregarded the protocol he had originally adopted, and fabricated allegations of attorney misconduct to camouflage his own unreasonable and injudicious conduct.

{¶ 16} While the case was pending on appeal, Shimko filed a second affidavit of disqualification, casting many of the same allegations contained in his appellate briefs. Chief Justice Thomas J. Moyer dismissed Shimko's second affidavit of disqualification. On May 17, 2010, Shimko filed a third affidavit of disqualification against Judge Markus, in which he reiterated most of the allegations from his previous affidavits. On May 24, 2010, the court of appeals affirmed Judge Markus's grant of a mistrial. *First Fed. Bank of Ohio v. Angelini,* 3d Dist. No. 3-09-03, 2010-Ohio-2300. On May 26, 2010, Chief Justice Eric Brown dismissed Shimko's third affidavit of disqualification, stating, "Shimko is cautioned that the filing of any further frivolous, unsubstantiated, or repeated affidavits of disqualification involving the underlying case may result in an imposition of appropriate sanctions."

{¶ 17} Shimko does not deny writing any of the above comments in his briefs or affidavits. He indicates that he believed them to be true. He denies that he intended them to impugn Judge Markus's integrity and claims that to find a violation of Prof.Cond.R. 8.2(a) and 8.4(h) would chill the right of future litigants to file affidavits of bias. Shimko argues that he had a "firmly held belief" that Judge Markus violated his duty as a judge and that Shimko had a right to

complain about the conduct of Judge Markus. He refers to *Gardner*, which cited with approval the rationale from courts of other states that "an objective malice standard strikes a constitutionally permissible balance between an attorney's right to criticize the judiciary and the public's interest in preserving confidence in the judicial system: Lawyers may freely voice criticisms supported by a reasonable factual basis even if they turn out to be mistaken." *Gardner,* 99 Ohio St.3d 416, 2003-Ohio-4048, 793 N.E.2d 425, at ¶ 30, citing *Standing Commt. on Discipline, United States Dist. Court, Cent. Dist. of California v. Yagman*, 55 F.3d 1430, 1438 (9th Cir.1995). In his closing argument before the panel, Shimko asked rhetorically whether Ohio "attorneys must sacrifice their client's constitutional right to a fair and impartial trial at the altar of judicial deference."

{¶ 18} The board found that Shimko's arguments missed the point of the complaint. Shimko has had and continues to have the right to allege violations by judicial officers in the proper forum and by using the proper method under the rules provided by this court. The board stressed that it found no violation in the filing or specific factual examples used to support these allegations. What it found as actionable violations was the use of ad hominem attacks and hyperbole in appellate briefs and posttrial affidavits, including the following: "fabricating allegations," "completely fabricating the basis for his decision," "deliberately misrepresenting," "contriving a reason," and "personally invested in the outcome."

{¶ 19} Shimko concedes that attorneys do not have an unfettered right to say whatever they desire about a member of the judiciary during or after trial. He argues, however, that as long as the subjective belief appears reasonable to the attorney, all comments are permissible regardless of the reckless disregard of the truth. The board found such a subjective test unworkable as the test for falsity or reckless disregard of the truth. We note that the difference between acceptable fervent advocacy and misconduct is not always easily distinguishable.

**{¶ 20}** The board's finding was consistent with this court's holding in *Gardner*.

**{¶ 21}** As the Court of Appeals of New York observed in *In re Holtzman,* 78 N.Y.2d 184, 192, 573 N.Y.S.2d 39, 577 N.E.2d 30 (1991), adopting a subjective standard "would immunize all accusations, however reckless or irresponsible, from censure as long as the attorney uttering them did not actually entertain serious doubts as to their truth." The state's interest in protecting the public, the administration of justice, and the legal profession supports applying a different standard in disciplinary proceedings. *In re Chmura,* 461 Mich. 517, 543, 608 N.W.2d 31 (2000), citing *United States Dist. Court, E. Dist. of Wash. v. Sandlin,* 12 F.3d 861, 867 (9th Cir.1993).

**{¶ 22}** In *Gardner,* we imposed a six-month suspension from the practice of law upon an attorney who accused the court of appeals panel of being dishonest and of ignoring well-established law. *Gardner*, 99 Ohio St.3d 416, 2003-Ohio-4048, 793 N.E.2d 425, at ¶ 36. We concluded that that attorney had violated DR 8-102(B), the predecessor to Prof.Cond.R. 8.2(a). *Id.* at ¶ 3.

**{¶ 23}** In *Proctor,* 131 Ohio St.3d 215, 2012-Ohio-684, 963 N.E.2d 806, at ¶ 6-8, attorney Phillip Proctor falsely accused a judge in two separate pleadings of harboring a bias against him, engaging in an ex parte communication with the prosecutor, and attempting to cover up or deny his actions. Although Proctor had originally stipulated to a violation of Prof.Cond.R. 8.2(a), he reneged on his stipulation at the disciplinary hearing. He claimed that he had a reasonable belief that the statements were true. *Id.* at ¶ 19. This court, citing *Gardner,* suspended Proctor for six months. *Id*. at ¶ 19-20.

**{¶ 24}** Shimko seeks to distinguish his misconduct from that of Gardner and Proctor by alleging that his genuinely held beliefs that Judge Markus's inappropriate actions adversely affected his client warrant a lesser sanction.

Shimko claims that Gardner and Proctor did not honestly believe in the rightfulness of their positions, as evidenced by their stipulations.

## CONCLUSIONS OF LAW

**{¶ 25}** The board determined that the findings of Chief Justice Thomas J. Moyer and Chief Justice Eric Brown as to the lack of claimed bias of Judge Markus are binding. *See State v. Getsy,* 84 Ohio St.3d 180, 702 N.E.2d 866 (1998), and *Haney v. Trout,* 10th Dist. Nos. 00AP-1448 and 00AP-1457, 2002 WL 205997 (Feb. 12, 2002). The board concluded, in the alternative, that no objective, reasonable evidence exists to support the allegations in Shimko's briefs or affidavits as to the specific claimed impropriety or bias of Judge Markus. The fact that the trial court ruled against Shimko in matters of evidence or procedure does not equate to bias or show in and of itself improper conduct by the court.

**{¶ 26}** The board considered numerous statements concerning Judge Markus that Shimko admits writing. The board concluded that these statements were proved by clear and convincing evidence to be unreasonable and objectively false with a mens rea of recklessness.

**{¶ 27}** The board concluded that holding Shimko accountable for his conduct would not violate or chill his First Amendment rights under the United States Constitution or his rights under Article I, Section II of the Ohio Constitution. *See Gardner,* 99 Ohio St.3d 416, 2003-Ohio-4048, 793 N.E.2d 425, at ¶ 14-16. Rules of conduct that prohibit impugning the integrity of judges are not designed to shield judges from criticism but are to preserve public confidence in the fairness and impartiality of our system of justice. *See id.* at ¶ 28–29, citing *In re Terry,* 271 Ind. 499, 502, 394 N.E.2d 94 (1979), and *In re Graham*, 453 N.W.2d 313, 322 (Minn.1990).

**{¶ 28}** The board concluded, by clear and convincing evidence, that Shimko had violated Prof.Cond.R. 8.2(a) (forbidding making statements known to be false or with reckless disregard to their truth or falsity concerning the

qualification or integrity of a judicial officer) and 8.4(h) (forbidding conduct that adversely reflects on the fitness to practice law).

## AGGRAVATION, MITIGATION, AND SANCTION

{¶ 29} Shimko made written statements accusing a judicial officer of dishonesty and improper motives in his rulings. These statements were deliberate and calculated and made over a nine-month period. Some were part of an apparent strategy to convince the court of appeals to overturn Judge Markus's decision. Shimko was unapologetic and did not acknowledge the wrongful nature of his conduct. He continues to maintain the reasonableness of his accusations of Judge Markus's bias and of his commitment to serve his client. Shimko received a public reprimand on June 23, 2009, from the Arizona Supreme Court, for which he was reciprocally disciplined in Ohio. *Disciplinary Counsel v. Shimko,* 124 Ohio St.3d 1201, 2009-Ohio-6879, 918 N.E.2d 1007.

{¶ 30} Shimko was cooperative in the disciplinary process, and no apparent damage has been done to Judge Markus's reputation. Shimko has an excellent reputation with the bench and bar and is an intelligent, accomplished, and competent attorney who zealously represents his clients to the best of his ability. Based on his demeanor, the board determined that he subjectively, yet honestly, believes in the rightfulness of his position. Consequently, the board did not conclude that his motives were dishonest. Finally, his sanctionable statements were made in a forum in such a way that it is likely that only the bench and opposing counsel would see them; at no time was the sanctionable activity shown to the jury or general public.

{¶ 31} The board adopted the findings of fact, conclusions of law, and recommendation of the panel. It recommends that Timothy Andrew Shimko be suspended from the practice of law for a period of six months.

{¶ 32} We agree that Shimko should be sanctioned and suspended; nevertheless, we conclude that the suspension should be stayed. In reversing the

suspension and fine of an attorney, a federal court of appeals stated, "Attorneys should be free to challenge, in appropriate legal proceedings, a court's perceived partiality without the court misconstruing such a challenge as an assault on the integrity of the court." *United States v. Brown,* 72 F.3d 25, 29 (5th Cir.1995). That court has also stated that "because attorney suspension is a quasi-criminal punishment in character, any disciplinary rules used to impose this sanction on attorneys must be strictly construed resolving ambiguities in favor of the person charged." *In re Thalheim,* 853 F.2d 383, 388 (5th Cir.1988).

{¶ 33} Our conclusion is largely based upon the fact that the statements in this case, although made in "a public document, would receive about as much scrutiny from the public if [they] were written on the wind." *Gardner*, 99 Ohio St.3d 416, 2003-Ohio-4048, 793 N.E.2d 425, at ¶ 43 (Pfeifer, J., dissenting). In *Gardner*, the offending statements were between the "attorney and the bench, and were presented in such a way that only the bench and opposing counsel would see them." *Id.* Likewise, Shimko's remarks and allegations were either made out of earshot of the jury or in filings to the chief justice of this court or to the court of appeals.

{¶ 34} There is, admittedly, a fine line between vigorous advocacy on behalf of one's client and improper conduct; identifying that line is an inexact science. Although Shimko's comments about Judge Markus were rough, unnecessary and ultimately unproductive, they were less defamatory than Gardner's rant against three judges on the court of appeals. Moreover, as the panel noted, Shimko was cooperative in the disciplinary process. And there has been no apparent damage done to Judge Markus's reputation.

{¶ 35} Shimko could have and should have presented his allegations one at a time, pointing to the record and using words that were powerful, but less heated. It is his choice of language, not his right to allege bias in his affidavits and in his appellate briefs, that brought him before the disciplinary counsel. In

*Gardner*, we held that "[u]nfounded attacks against the integrity of the judiciary require an actual suspension from the practice of law." *Gardner*, 99 Ohio St.3d 416, 2003-Ohio-4048, 793 N.E.2d 425, at ¶ 36, citing *Disciplinary Counsel v. West*, 85 Ohio St.3d 5, 706 N.E. 2d 760 (1999). Here, we conclude that Shimko's comments are not equivalent to those in *Gardner*, even though his vigorous advocacy went too far. Such behavior by an attorney should not go without sanction.

{¶ 36} Accordingly, Shimko is suspended from the practice of law in Ohio for one year, with the entire suspension stayed on condition that he commit no further misconduct. Costs are taxed to Shimko.

Judgment accordingly.

LUNDBERG STRATTON, O'DONNELL, and CUPP, JJ., concur.

O'CONNOR, C.J., and LANZINGER and MCGEE BROWN, JJ., dissent.

_____

**O'CONNOR, C.J., dissenting.**

{¶ 37} I dissent because the majority ignores a long-standing, bright-line rule: "Unfounded attacks against the integrity of the judiciary require an actual suspension from the practice of law." *Disciplinary Counsel v. Gardner*, 99 Ohio St.3d 416, 2003-Ohio-4048, 793 N.E.2d 425, ¶ 36, citing *Disciplinary Counsel v. West*, 85 Ohio St.3d 5, 706 N.E.2d 760 (1999), and *Columbus Bar Assn. v. Hartwell*, 35 Ohio St.3d 258, 520 N.E.2d 226 (1988).

{¶ 38} For that reason, I would impose six months' actual suspension, as recommended by the board.

### *The relevance of the affidavits of disqualification*

{¶ 39} As a threshold issue, the majority should clarify that Shimko's affidavit-of-disqualification filings are relevant only for purposes of providing context. In those proceedings, it was determined that Shimko's allegations against Markus were "frivolous" and "unsubstantiated." Even so, the content of Shimko's

affidavits of disqualification is not a basis for his discipline. Rather, the board independently reviewed Shimko's allegations—made elsewhere—and concluded that his statements were unfounded.

**{¶ 40}** Ohio's statutory affidavit-of-disqualification process authorizes the removal of a judge from a case if a party or attorney can prove that the judge has (1) an interest in the litigation or (2) a bias or prejudice for or against a party or counsel. R.C. 2501.13 (appellate judges), 2701.03 (common pleas judges), 2101.39 (probate judges), and 2701.031 (municipal and county judges).

**{¶ 41}** Three times, Shimko availed himself of the affidavit-of-disqualification process, seeking Markus's removal from the case. Three times, Shimko was unsuccessful.

**{¶ 42}** The board expressly held that Shimko's first filing did not constitute a violation of the disciplinary rules. Board report at ¶ 33. It did not explicitly reach the issue of whether the second and third filings constituted violations, but it did make clear that its findings that Shimko violated the rules were not based on any of his affidavit-of-disqualification filings. *Id.* at ¶ 28. In doing so, it emphasized that the affidavit-of-disqualification process is the "proper forum" "to allege violations of judicial officers." *Id.*

**{¶ 43}** The majority purports to accept the board's findings but also concludes that an actual suspension is not required, in part because " '[a]ttorneys should be free to challenge, *in appropriate legal proceedings*, a court's perceived partiality without the court misconstruing such a challenge as an assault on the integrity of the court.' " (Emphasis added.) Majority opinion at ¶ 32, quoting *United States v. Brown*, 72 F.3d 25, 29 (5th Cir.1995).

**{¶ 44}** I agree with the board that the affidavit-of-disqualification procedure is the appropriate legal proceeding through which attorneys may pursue claims of judicial bias. And Shimko was permitted considerable latitude in that

14

context. Because Shimko is not being disciplined on that basis, the majority's reliance on the Fifth Circuit's opinion in *Brown* is misplaced.

### *Actual suspension is required*

{¶ 45} The majority concedes that the board's recommendation for six months' actual suspension "was consistent with this court's holding in *Gardner*." Majority opinion at ¶ 20. Yet it reaches a different result by relying primarily on Justice Pfeifer's dissenting opinion in *Gardner*, which attracted not a single vote other than Justice Pfeifer's.

{¶ 46} In *Gardner*, we rejected the board's recommendation to impose a stayed suspension from the practice of law. *Gardner,* 99 Ohio St.3d 416, 2003-Ohio-4048, 793 N.E.2d 425, at ¶ 12. Gardner had been representing a criminal defendant on appeal. The appellate court issued a decision in favor of the prosecution. Gardner filed a motion for reconsideration in which he accused the panel of being dishonest and ignoring well-established law. Among other things, he accused the panel of being "results driven." *Id.* at ¶ 3.

{¶ 47} Facing discipline, Gardner stipulated that by making the remarks, he engaged in undignified or discourteous conduct that was degrading to a tribunal, in violation of former DR 7-106(C)(6). But he contested the allegation that he had knowingly made a false accusation about a judge in violation of former DR 8-102(B). The board disagreed and found that clear and convincing evidence proved that he had. *Id.* at ¶ 12.

{¶ 48} We adopted those findings but held that Gardner's license had to be suspended because, as a matter of course, "[u]nfounded attacks against the integrity of the judiciary require an actual suspension from the practice of law." *Id.* at ¶ 36, citing *West*, 85 Ohio St.3d 5, 706 N.E.2d 760, and *Hartwell*, 35 Ohio St.3d 258, 520 N.E.2d 226.

{¶ 49} In so holding, we explained that false allegations about a judicial officer that are made in court filings are especially egregious. *Id.* at ¶ 22. "A

courtroom is not a forum for personal or political grandstanding, and the attorneys who practice in it 'possess, and are perceived by the public as possessing, special knowledge of the workings of the judicial branch of government.' " *Id.*, quoting *State ex rel. Oklahoma Bar Assn. v. Porter*, 766 P.2d 958, 969 (Okla.1988). Therefore, "[l]awyers' statements made during court proceedings are 'likely to be received as especially authoritative.' " *Id.*, quoting *Gentile v. Nevada State Bar*, 501 U.S. 1030, 1074, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991).

{¶ 50} Notably, Justice Pfeifer disagreed with that judgment. He concluded, singularly, that Gardner's motion for reconsideration, "while a public document, would receive about as much scrutiny from the public if it were written on the wind." *Id.* at ¶ 43 (Pfeifer, J., dissenting). He agreed with Gardner that a public reprimand would have been sufficient, "especially given the virtually nonpublic release of his comments." *Id.* at ¶ 45.

{¶ 51} Similarly here, the majority refuses to impose an actual suspension, as required by *Gardner*, and explains that its refusal "is largely based upon the fact that the statements in this case, although made in 'a public document, would receive about as much scrutiny from the public if [they] were written on the wind.' " Majority opinion at ¶ 33, quoting *Gardner* at ¶ 43 (Pfeifer, J., dissenting).

{¶ 52} Moreover, the majority does damage to the bright-line *Gardner* rule by waxing poetic about the "fine line between vigorous advocacy on behalf of one's client and improper conduct; identifying that line is an inexact science." Majority opinion at ¶ 34. I do not agree that the line is so fine.

{¶ 53} Attorneys must conform their behavior to what is reasonable, not what is perfect. *See Gardner* at ¶ 30. "Lawyers may freely voice criticisms supported by a reasonable factual basis even if they turn out to be mistaken." *Id.* What we require of attorneys in this context is not unique: "The court room is not

a place for groundless assertions, whatever their nature." *In re Cobb*, 445 Mass. 452, 473, 838 N.E.2d 1197 (2005).

{¶ 54} Nor am I persuaded by the majority's attempt to distinguish *Gardner*. Both Gardner and Shimko made false statements about a judicial officer. Both attorneys made the relevant statements in court filings. Both represented that they subjectively believed their statements.

{¶ 55} We imposed an actual suspension upon Gardner even though he had no history of discipline and even though he had apologized for the manner in which he expressed his frustration. He conceded that he had behaved neither appropriately nor professionally.

{¶ 56} In contrast, Shimko has a history of discipline. In 2009, we publicly reprimanded him. *Disciplinary Counsel v. Shimko,* 124 Ohio St.3d 1201, 2009-Ohio-6879, 918 N.E.2d 1007. And before us now, he shows no contrition.

### *Conclusion*

{¶ 57} Deference to an established majority opinion, despite an individual judge's disagreement with the opinion, is part of the court's rich tradition of adherence to stare decisis. *See, e.g.*, *Shay v. Shay*, 113 Ohio St.3d 172, 2007-Ohio-1384, 863 N.E.2d 591, ¶ 27, quoting *Taylor v. Natl. Group of Cos., Inc.,* 65 Ohio St.3d 482, 483, 605 N.E.2d 45 (1992) (Holmes, J., concurring). I am confounded by the majority's willingness to so readily disregard *Gardner*.

{¶ 58} As the majority conspicuously explained, "The board's finding was consistent with this court's holding in *Gardner*." Majority opinion at ¶ 20. I wholeheartedly agree. For that reason, I would impose six months' actual suspension, as recommended by the board.

LANZINGER and MCGEE BROWN, JJ., concur in the foregoing opinion.

_____

Jonathan E. Coughlan, Disciplinary Counsel, and Joseph M. Caligiuri, Senior Assistant Disciplinary Counsel, for relator.

Richard C. Alkire Co., L.P.A., Richard C. Alkire, and Dean Nieding, for respondent.

_____